## Preece v. Commonwealth ex rel. Maynard.

(Decided March 22, 1935.)

JASPER H. PREECE and W. R. McCOY for appellant.

BAILEY P. WOOTTON, Attorney General, and RAY L. MURPHY, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

This is a bastardy proceeding instituted in the county court of Martin county pursuant to the provisions of section 166 et seq. of our present Statutes, composing chapter 10 of the 1930 edition thereof. The mother of the illegitimate child was and is Gladys Maynard, a widow 26 years of age, and the alleged putative father proceeded against was and is appellant and defendant below, Golden Preece. He interposed three defenses: (1) Not guilty; (2) that the mother was a married woman at the time the child was begotten and to whom the remedy invoked is unavailable; and (3) settlement made with the mother. There was a verdict of not guilty in the county court, and the commonwealth, on relation of the mother, prosecuted an appeal to the Martin circuit court. A trial therein resulted in a verdict of guilty, upon which the court pronounced judgment against defendant, requiring him to pay to the mother for the use and benefit of the infant bastard child the sum of $7.50 per month (as fixed by the verdict) until it arrived at the age of 16 years. From that judgment he prosecutes this appeal.

A motion was made in the circuit court to dismiss the appeal upon the grounds (a) that no motion for a new trial was made in the county court before prosecuting it, and (b) that no appeal bond was executed by the commonwealth in taking the appeal to the circuit court. Each of them was overruled, and they appear to have been abandoned on this appeal, since the brief for appellant is silent thereon. However, if they were urged before us, we would decline to sustain either of them, since the trial of the case on appeal to the circuit court is de novo and requires no motion for a new trial in the initial county court to make it available to the losing party in that court, and, since the appeal was prosecuted by the commonwealth, no bond should be required of it. We will therefore proceed to a discussion of the

three grounds, supra, argued in brief for appellant, and in which we will dispose of them in the order named.

■ The positive testimony of the mother was that some time prior to July, 1931, defendant began visiting her, which he continued regularly. On the 19th day of that month they engaged in their first act of illicit intercourse, and which was continually repeated for a considerable time thereafter. Defendant admits such mutual relations, but claims that it did not begin until later than the date fixed by the relatrix, and which was at a time as he claims when he, according to the laws of nature, could not have been the father of her child. However, the date he fixed for the beginning thereof was only about a month after the date testified to by the child's mother, and, according to his testimony, he could have been the father of the child if it had been one of normal, though exceptionally early, birth. However, the jury believed the testimony of the child's mother in preference to that of defendant, which it had the right to do, and under no rule of practice are we authorized to accept the contention that the verdict is flagrantly against the evidence or not sustained by it with reference to this issue.

■ It is argued in support of ground 2 that Mrs. Maynard was married to Shirley Maynard in 1922 and never divorced. They lived together until some time in 1929, when he was supposed to have been drowned, produced by an automobile in which he was riding with two others leaving the highway and running into a stream crossed by it. His body was never found, the stream being at flood tide at the time of the accident; but that of one of the occupants of the car was found twelve days thereafter. The third occupant gave his deposition in this case, and stated that, because of his condition at the time (partly produced by prior intoxication and partly by the effects of the accident), he was unable to state positively what became of Shirley Maynard, who was driving the car at the time. That witness, however, did state that he later saw the body of the other occupant after it had been found; but, since nothing was thereafter heard of Shirley Maynard, no one testified to having seen his corpse, and we are convinced that the circumstances were and are such as to authorize the inference that he was

drowned as a result of the accident referred to, as was true of one of his companions in the car at the time.

It was shown that after the accident the car was practically submerged in the stream, thus affording competent proof of such a consequence, and, when there is added thereto the additional fact that Shirley Maynard has not since been heard from, there is but little escape from the conclusion that he lost his life by drowning on that occasion. At any rate, the testimony was sufficient on that issue to support the verdict of the jury to which it was submitted by the court.

■ The alleged settlement relied on in support of ground 3 was executed by the mother of the infant on February 28, 1933. Defendant did not subscribe it, and the substance of it was that, in consideration of $50 paid to Gladys Maynard, she agreed to not institute this or any other kind of proceedings, either criminal or civil, against defendant as the father of her child, which was born in March, 1932, and who was then about 11 months old. The writing closes by saying: "And that the above amount is accepted by her (Gladys Maynard) for all damages or claims *she* may have against the said Golden Preece." (Our italics.) That excerpt clearly indicates that the purpose of the writing was to liquidate and settle any claim that *the mother* of the child might have against defendant, when our bastardy statute, supra, is primarily intended to afford a remedy for relief of the unfortunate infant, whereby it, on relation of its mother, may compel the putative father to discharge his duty to it by contributing to its support and its necessities during infancy. But, however that may be, this court in an opinion by Judge Robertson in the case of Burgen v. Straughan, 7 J. J. Marsh. 583, 586, when considering a similar statute, said: "For his duty to maintain his own child does not depend on her inability to do it, but on the natural relation which he sustains to a helpless being whom he contributed to bring into the world." That opinion was rendered on October 19, 1832, and on October 22, 1836, the case of Commonwealth v. Turner, 4 Dana, 511, 513, was decided, the opinion being written by the same judge; and in denying a similar contention made therein it was said: "But it has never been said by this Court, or by any other authoritative tribunal, so far as we are informed, that

any such contract between the father and mother of a bastard child would bar a legal proceeding under the statute of 1795, concerning bastardy. And, in the case just cited, that point was expressly, and rather significantly, reserved. Indeed, no principle yet settled is inconsistent with the conclusion, that such a contract should not operate as a bar to such a proceeding."

Thirty-three years afterwards, and on December 8, 1869, the same learned judge upon a return to this court as a member of it rendered the opinion in the case of Commonwealth v. Davis, 6 Bush, 295. In that case the mother had attempted to make settlement with the putative father *after* the bastardy proceedings had been instituted, and which he thereafter relied on in defense to its further prosecution. The court sustained him therein and dismissed the proceedings against him, but which judgment Judge Robertson, for this court, reversed, basing his opinion partially upon the Turner Case, supra. In it he said, inter alia: "After the proceeding had been initiated, and the court had acquired jurisdiction over it, the mother had no legal control over it"—which, in effect, was that she herself could not dismiss it, and a fortiori, the adverse litigant against whom it was prosecuted could not *enforce* a dismissal because of the alleged settlement.

Counsel for defendant cite a number of cases, among which are Smith v. Wagers' Adm'rs, 238 Ky. 609, 38 S. W. (2d) 685; Mayfield v. Cupp, 251 Ky. 328, 64 S. W. (2d) 884; and Perry v. Lambert's Guardian, 251 Ky. 561, 65 S. W. (2d) 678. In them certain agreements and contracts made between the mother and the putative father, and based upon valuable considerations, were involved. They were sought to be enforced by the infant for whose benefit and on whose behalf they were made, and wherein the putative father agreed in consideration of the mother surrendering the child to him that he would do certain things with reference to it, among which was to leave it a specified portion of his property at his death. Each of the contracts was entirely executed and performed on the part of the mother, and, so far as the infant was concerned, there was not involved in either of them the nurturing and taking care of it during infancy, but which it was the purpose of the statute to accomplish. Moreover, the opinions, supra, stated that such settlement agreements,

when sustainable at all, must be such as is fair, equitable and adequate for the purposes intended, and not a mere trifling subterfuge by which a guilty father may escape the moral duty to contribute to the rearing and nurturing of his child by the payment of a pittance, which its wretched and distressed, and frequently impoverished, mother might be induced to accept, rather than to expose her shame and disgrace through a public investigation, and also through the desire to create no public record whereby the life of her child would be forever disgraced thereafter.

In this case the payment of the $50 was made by the defendant's father or by others than himself, and in small quantities for buying shoes and other articles of clothing that the unfortunate infant needed from time to time. It was by no means adequate for even that purpose, to say nothing about the preservation of its health in case of sickness or the culture of its mind through attending schools when it reached that age. In the circumstances, we would not feel authorized to uphold the settlement as a bar to the action, even if it had been made before its beginning, but which was untrue, since the affidavit for the warrant was previously made and filed, although defendant was, perhaps, not apprehended thereon until a later date.

We find no reversible error in the record, and the judgment is affirmed.